BARRY J. PORTMAN
Federal Public Defender
DANIEL P. BLANK
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant BARROW

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | No. CR 07-0403 MMC |
| Plaintiff, | ) | |
| | ) | SENTENCING MEMORANDUM |
| v. | ) | |
| | ) | Honorable Maxine M. Chesney |
| FLOYD A. BARROW, | ) | December 12, 2007 |
| | ) | 2:30 p.m. |
| Defendant. | ) | |

SENTENCING MEMORANDUM

**INTRODUCTION**

Defendant Floyd Barrow respectfully requests that the Court impose upon him a sentence of 36 months based upon a combination of factors under 18 U.S.C. § 3553(a), including his post-offense rehabilitation, extraordinary acceptance of responsibility, and lack of youthful guidance.

**ARGUMENT**

**I.    THE COURT IS NOT REQUIRED TO IMPOSE A GUIDELINE SENTENCE**

It is undisputed that the advisory guideline sentencing range for Mr. Barrow is 57 to 71 months, based upon an adjusted offense level of 21 and criminal history category IV.  PSR ¶ 94.  The Probation Office recommends a sentence of 57 months, at the low end of the range.  *See* PSR Recommendation.  However, the Court is no longer bound to impose a guideline sentence.

Freed from the requirement of mandatory sentencing guidelines, district courts are now guided in their sentencing discretion by the remaining statutory enactments of Congress.  As a result of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), the guidelines are now just one of many sources that courts must consult at sentencing.  Instead, the provisions of several statutes must be weighed and considered by courts to determine the minimum sentence necessary to achieve the purposes of sentencing.  Together these statutes require a more balanced and individualized approach to determining a fair and just sentence than was previously permitted under the guidelines.

The Supreme Court in *Booker* directs sentencing courts to the remaining provisions of the Sentencing Act, particularly § 3553(a), for guidance in determining a "reasonable" sentence. *Booker,* 543 U.S. at 233-34.  Section 3553(a) mandates that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)."  18 U.S.C. § 3553(a); *see also* 18 U.S.C. § 3551(a) (providing that a defendant "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case").  Those purposes are:

SENTENCING MEMORANDUM              - 1 -

> the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In addition to setting forth the purposes for courts to achieve at sentencing, § 3553(a) enumerates several other factors, beyond the overall purposes of sentencing articulated in § 3553(a)(2), for courts to consider in exercising its sentencing discretion, only one of which is the now-advisory guidelines. Specifically, § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider" the following: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; "the kinds of sentence and the sentencing range established" by the guidelines and "any pertinent policy statement" issued by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1), (3)-(7).

Moreover, Congress has emphasized that, in considering these factors, sentencing courts are obligated to bear in mind that lengthy imprisonment may not be the best way to achieve the statutory goals of sentencing: "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Thus, courts are required by statute to impose a reasonable sentence, taking into account all of the factors of 18 U.S.C. § 3553(a).

**II.  BALANCE OF FACTORS IN COMBINATION WARRANT 36 MONTH SENTENCE**

A sentence of 36 months imprisonment is warranted in this case based upon the combination of the following factors under 18 U.S.C. § 3553(a): significant post-offense rehabilitation;

extraordinary acceptance of responsibility; and serious lack of youthful guidance. Each of these factors as applied to Mr. Barrow is addressed in turn below.

### A.     Mr. Barrow Has Demonstrated Significant Post-Offense Rehabilitation

During the more than two years between Mr. Barrow's criminal conduct in this case on July 8, 2005, and his federal arrest for that conduct on August 1, 2007, Mr. Barrow has demonstrated significant post-offense rehabilitation. As noted in the Presentence Report, Mr. Barrow "grew up in a public housing complex in San Francisco, in which drug and gang activity appears to be prevalent." PSR ¶ 110. Mr. Barrow "appears to have acquiesced to these influences for most of his adolescence and young adulthood." *Id.* However, at the time of his arrest, Mr. Barrow "was living with his significant other and two young children, volunteering for anti-violence and community youth programs, and caring for his ailing grandmother." *Id.* As such, the Presentence Report concludes that Mr. Barrow "made a certain amount of positive change between the time of the instant offense and his arrest." *Id.*

One of Mr. Barrow's greatest contributions since the offense conduct in this case has been as "an active volunteer with Brothers Against Guns, a nonprofit anti-violence project founded by Shawn Richards, a well known local activist." PSR ¶ 79. Mr. Richards has personally confirmed that prior to his arrest Mr. Barrow was active in this program, and described him as a "good kid," indicating "that at the time of Mr. Barrow's arrest he had been contemplating offering him a paid position in his organization." *Id.* Specifically, prior to his arrest, Mr. Barrow "was a participant in 'Operation Contact,' an effort to orchestrate a cease-fire between two housing complexes in San Francisco after several gang related shootings." PSR ¶ 80. Individuals "from both neighborhoods met at a local community center and agreed not to provoke additional violence." *Id.* "Mr. Richards confirmed that Mr. Barrow was involved in the truce negotiations." *Id.* Significantly, "there have been no additional casualties since the truce was established." *Id.*[1]

---

[1] It is worth emphasizing that Mr. Barrow is not now and has never been a member of any gang. PSR ¶ 78. He is incorrectly "considered by law enforcement to be a gang member because he is from a housing complex controlled by a gang (Knock Out Posse)." *Id.* However, Mr. Barrow

SENTENCING MEMORANDUM                - 3 -

In addition to his anti-violence efforts, Mr. Barrow has also been active in the community in support of youth sports. Specifically, Mr. Barrow was at the time of his arrest "a volunteer at the San Francisco Boys and Girls Club and at the Hamilton Recreation Center where, among other things, he coached nine-and-under basketball." PSR ¶ 88. Mr. Barrow's "own son was involved in the program and Mr. Barrow saw this as a good opportunity to be involved in his son's activities." *Id.* Unfortunately for everyone present, Mr. Barrow's "arrest for the instant offense occurred at the Hamilton Recreation Center." *Id.*

Moreover, at the time of his arrest, Mr. Barrow was gainfully employed selling clothes for "Your Closet, a mobile clothing retailer." PSR ¶ 86. Mr. Barrow's work in this regard was actually part of a larger clothing business cooperative called "Urban Couture," which according to Mr. Carlos Levexier (Violence Prevention Specialist for the Western Addition Family Resource Center and board member for the Marin Luther King – Marcus Garvey Square Cooperative Apartments) was started by Mr. Barrow and other young people from his neighborhood. *See* Attachment A (11/19/07 Levexier Letter). This business cooperative "was truly the talk of the neighborhood" and Mr. Barrow and his partners "were featured in an article in the neighborhood paper, the Western Edition, as well as honored at San Francisco City Hall." *Id.*

Not surprisingly, during the two-year time period between the offense conduct and his arrest, Mr. Barrow's law enforcement contacts dropped off dramatically. As noted in the Presentence Report, Mr. Barrow had only four relatively minor law enforcement contacts during that two year period preceding his arrest in this case: "twice on warrants and marijuana charges; once for disturbing the peace; and once after he was the victim of a shooting." PSR Recommendation at 2. Although any criminal activity is too much, these contacts do represent a marked improvement and Mr. Barrow is committed to addressing his root substance abuse problem. *See* Part B. *infra.*

---

"never joined the gang" and "has no tattoos that would normally signify gang membership," although "many members of the gang are people he grew up with, friends and cousins." *Id.* As recounted in the Presentence Report, "Mr. Richards noted that it is not uncommon for young men who grow up in public housing projects to be labeled as gang members due to their coincidental associations." PSR ¶ 79.

SENTENCING MEMORANDUM - 4 -

Last but not least, at the time of his arrest, Mr. Barrow was living with and supporting the mother of his children, Ms. Naimah Young. PSR ¶ 77. Mr. Barrow and Ms. Young have known each other since they were children and grew up in the same dangerous housing complex. *Id.* Unfortunately, due to Mr. Barrow's arrest and his resulting inability to support her financially, Ms. Young and their children have been forced to leave their home and move back into their old housing complex with her grandmother. *Id.*

In sum, these circumstances show that in the intervening two years between the 2005 conduct underlying the current federal charge against Mr. Barrow and his 2007 arrest on that charge Mr. Barrow has demonstrated significant post-offense rehabilitation that should be taken into account at sentencing.

**B.     Mr. Barrow Has Shown Extraordinary Acceptance of Responsibility**

It is unfortunate that the prosecution in this case occurred "right when things were starting to go well" for Mr. Barrow. PSR ¶ 83; *see also* Attachment B (12/1/07 Letter from Mr. Barrow). Nevertheless, Mr. Barrow has fully accepted responsibility for having knowingly possessed the firearm in this case on the day in question. To this end, Mr. Barrow promptly pleaded guilty to the charged offense in this case, felon firearm possession, without the benefit of any agreement with the government. Moreover, in doing so, Mr. Barrow voluntarily forfeited two significant evidentiary issues that could have substantially hindered his conviction at trial. Mr. Barrow also candidly admitted during his Presentence Interview to a history of drug addiction. As such, Mr. Barrow's acceptance of responsibility should be recognized as extraordinary.

As an initial matter, it is worth noting that the conduct underlying the offense of conviction in this case was first prosecuted in state court, with the matter being dismissed at the preliminary hearing stage on December 9, 2005, due to a lack of evidence against Mr. Barrow. PSR ¶ 62. The gun at issue was not purchased by Mr. Barrow, and he was never seen by anyone as having actually possessed it or any gun like it. Instead, on the day in question, police officers saw "a group of approximately six to eight young black males" standing around a car "with two young black females

sitting inside." PSR ¶ 8. As the police arrived, the young men scattered, leaving Mr. Barrow as the last to disperse. *Id.* Before Mr. Barrow fled, the officers heard the thud of an object hitting the floorboard of the car. PSR ¶ 9. A Hi-Point C9 nine millimeter pistol serial number P1256107 was later recovered from the driver's side floorboard. PSR ¶ 10. The officers apprehended Mr. Barrow, whom they recognized from the neighborhood, and accused him of throwing the gun into the car. *Id.*

Despite the statements of the officers, Mr. Barrow was not held to answer on the charge in state court. No forensic evidence, such as fingerprints or gunshot residue, linked Mr. Barrow to the gun, and no registration information on the gun was available at that time. PSR ¶ 15. The driver of the car, whose identity was redacted from the police reports and not otherwise disclosed by the government, told the officers that she did not know any of the young men that she had been talking to around her car, but that "an unknown black male put something in her car" and "she did not know what it was or who put it there." PSR ¶ 17.

Additional evidence produced by the government in discovery here once the case was prosecuted federally two years later included registration information for the gun and DNA analysis suggesting that multiple people had handled the gun, including Mr. Barrow. PSR ¶¶ 17-18. However, this discovery raised serious questions about the quality of the government's proof against Mr. Barrow which could have been more fully investigated in support of his defense had Mr. Barrow not demonstrated an extraordinary acceptance of responsibility.

First, although the name of the woman driving the car in this case was redacted from the police reports and not otherwise disclosed by the government, and reportedly she had told the officers that she did not know any of the young men who were standing around her car, the woman was in fact known by Mr. Barrow as Shadae Jasper, the girlfriend of a street-level gun dealer named Philip. Along these lines, the discovery actually produced by the government indicates that the gun in this case, a Hi Point pistol serial number P1256107, was indeed registered to a young black male named Philip Alexander Fonsworth-McCorvey from San Francisco. *See* Attachment C (Bates FB0115). This discovery strongly suggests–barring some amazing coincidence–that the complaining witness in

SENTENCING MEMORANDUM                               - 6 -

fact lied to the police when stating that she did not know where the gun, found in her car and registered to her boyfriend, had come from, but that some unknown person had just come up and dropped it in there. Instead, the evidence is much more consistent with Ms. Jasper having brought the gun with her in the car, and shown it to the group of people there, and Mr. Barrow having been one of several people who briefly handled the gun before the police arrived.

Nevertheless, Mr. Barrow did not seek any discovery from the government regarding the current whereabouts of Ms. Jasper, in order to seek to interview her and investigate her credibility, or regarding what agreement if any she might have made with law enforcement officials for her putative testimony against Mr. Barrow. Instead, because Mr. Barrow fully accepted responsibility for having at least briefly possessed the gun on the day in question, he simply pleaded guilty and forfeited his right to seek such discovery from the government, even though such discovery likely would have yielded significant impeachment evidence against the government's complaining witness.

Second, although the DNA analysis produced by the government in discovery suggested a "likely match" with Mr. Barrow, DNA from at least one other person was also found on the pistol grip. PSR ¶ 18. Depending on the quantity of the DNA sample identified as a likely match for Mr. Barrow, the presence of DNA from other people could have substantially undermined the reliability of the analysis, raising the question of possible contamination, either at the scene when for example the officer who arrested Mr. Barrow then handled the gun, or in the laboratory. Nevertheless, Mr. Barrow again did not seek any additional discovery from the government regarding its DNA analysis because he fully accepted responsibility for having at least briefly possessed the gun on the day in question.

Finally, during his Presentence Interview, Mr. Barrow candidly "disclosed an addiction to cocaine, marijuana, and Vicodin." PSR ¶ 109. As noted in the Presentence Report, "[m]ost of his criminal history seems to be drug related." *Id.* Mr. Barrow has responded well to drug treatment in the past and is eager to resume treatment while in BOP custody. PSR ¶ 84. Thus, Mr. Barrow also accepts responsibility for his ongoing drug addiction.

Accordingly, based upon Mr. Barrow's open plea of guilty in lieu of seeking further discovery from the government, which would have been a burden on the resources of both the government and the Court, and his candid admission of drug addiction, the Court should find that Mr. Barrow has shown an extraordinary acceptance of responsibility.

### C.     Mr. Barrow Suffered from a Lack of Youthful Guidance

Finally, as noted in the Presentence Report, Mr. Barrow's "childhood involved little or no guidance from the adults who were responsible for his care." PSR ¶ 108. "The defendant, along with his cousins and siblings, was raised by his grandmother, because his parents were incarcerated for drug activities." *Id.* "It does not appear that the defendant is the product of skilled or even adequate parenting." *Id.*

Mr. Barrow is the second of four children to Ms. Vanessa Paillet, currently out of work on Worker's Compensation. PSR ¶ 73. The whereabouts of his father are currently unknown, and Mr. Barrow has never had meaningful contact with him. *Id.* Mr. Barrow and his siblings, along with several cousins, were raised by his maternal grandmother, since his parents, both addicted to crack cocaine, were incarcerated for much of his childhood. PSR ¶ 74. Although his grandmother was "doing the best she could" to raise them, Mr. Barrow and the other children were largely neglected. *Id.* (Mr. Barrow's grandmother currently suffers from dementia, and he was helping to care for her until his arrest in this case. *Id.*)  Mr. Barrow's uncle would sometimes stay in the household, but he had "mental problems" and would make the kids do "weird stuff" like hide in the bathroom for extended periods of time. PSR ¶ 75.

Growing up, Mr. Barrow did well in grade school, and played basketball and football. PSR ¶ 76. However, Mr. Barrow "did not get any support from home and eventually stopped participating in these activities." *Id.* Unfortunately, Mr. Barrow then got involved with drugs and his resulting criminal history then followed. PSR ¶ 84. Mr. Barrow never graduated from high school, but he later earned his GED. PSR ¶ 76. Thus, as emphasized in the Presentence Report, Mr. Barrow suffered from a serious lack of youthful guidance.

**CONCLUSION**

For the aforementioned reasons, based upon a combination of factors under 18 U.S.C. § 3553(a), including his post-offense rehabilitation, extraordinary acceptance of responsibility, and lack of youthful guidance, the Court should sentence Mr. Barrow to 36 months imprisonment.

Dated: December 5, 2007

>Respectfully submitted,
>
>BARRY J. PORTMAN
>Federal Public Defender
>
>         /S/
>
>DANIEL P. BLANK
>Assistant Federal Public Defender

SENTENCING MEMORANDUM          - 9 -